**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

FILED

James Roundtree              :     CIVIL ACTION NO. 3:10-CV-778 (JCH)

          Plaintiff,         :
                                          U.S. DISTRICT COURT
                             :             NEW HAVEN, CT

v.                           :

                             :

Securitas Security Services USA, Inc.  :

                             :

          Defendant.         :     May 18, 2010


## PLAINTIFF'S COMPLAINT

### Jurisdiction and Venue

1. This action arises under Title VII of the Civil Rights Act of 1964 codified as 42 U.S.C.
   2000e ("Title VII"), the Family and Medical Leave Act, codified as 29 U.S.C. §2611,
   *et seq*. ("FMLA"), the Connecticut Fair Employment Practices Act and Conn. Gen.
   Stat. 46a-60, *et seq*. ("CFEPA"), and state law.

2. The jurisdiction of this court is founded upon 28 U.S.C. §1331 (federal question) and
   the provisions of 28 U.S.C. §1343.

3. Venue is proper in the District of Connecticut pursuant to 28 U.S.C. §1391(b) in that
   the claims arose in this district and Plaintiff resides in this district.

4. Supplemental jurisdiction over Plaintiff's supplemental state law claims are invoked
   pursuant to 28 U.S.C. §1367 as the claims arise out of the same transaction and
   occurrences as Plaintiff's federal claims.

5. Costs, expert witness fees and attorney's fees are sought pursuant to 42 U.S.C.
   §1988.

1

6. Plaintiff filed a timely claim with the Connecticut Commission on Human Rights and Opportunities ("CCHRO").

7. Plaintiff filed a timely claim with the Equal Employment Opportunity Commission ("EEOC").

8. The CCHRO issued a Release of Jurisdiction to Plaintiff on April 30, 2010.

9. The EEOC issued a Notice of Right to Sue to Plaintiff on April 29, 2010.

## Plaintiff

10. James Roundtree (hereinafter referred to as the "Plaintiff") is a fifty-four (54) year-old male of African-American descent who resides at 19 Woodbridge Ave, Ansonia, Connecticut  06473; Plaintiff is married and is a deacon in his church.

## The Defendant

11. Securitas Security Systems USA, Inc. (hereinafter referred to as the "Defendant") is a Delaware corporation performing security services, registered to do business in the State of Connecticut, and employing more than five-hundred (500) persons; Defendant's agent for service is National Registered Agents, Inc., 12 Old Boston Post Rd, Old Saybrook, CT 06475; Defendant operates a branch at 30 Oak St, Stamford, CT 06905-4980.

## Facts

12. On or about October 6, 2006, Plaintiff began working for the Defendant in the position of Security Officer, and was assigned to work at the Norwalk Train Station at the LAZ Parking client site on a shift from midnight to 8:00 A.M.

13. Defendant is contracted by LAZ parking to oversee management of the Norwalk Train Station.

14. Kimberly Gibson is a Caucasian female responsible for writing tickets in the parking areas of the Norwalk Train Station.

15. In May of 2008, Ms. Gibson began to sexually harass Plaintiff.

16. Ms. Gibson would touch Plaintiff inappropriately in the following ways:

    a. She would put her hands on Plaintiff;

    b. She rubbed Plaintiff's shoulders;

    c. She would rub up against Plaintiff;

    d. She would invade Plaintiff's personal space by getting uncomfortably close to him; and

    e. She even followed Plaintiff out to his van at the end of his shift to touch and rub Plaintiff.

17. Plaintiff stated to Ms. Gibson, "I'm married, and I don't go that way."

18. Anthony Flowers had been a Plaintiff's direct supervisor until June 3, 2008.

19. Ms. Gibson and Mr. Flowers had frequent disagreements regarding his directions to the Defendant's employees, and Ms. Gibson had been trying to get Mr. Flowers in trouble.

20. Plaintiff was intimidated by Ms. Gibson because she had a reputation for getting others in trouble, and so Plaintiff reported her conduct to Mr. Flowers as his direct supervisor.

21. After initially telling Ms. Gibson, "I'm married, I don't go that way," Plaintiff made oral complaints to Anthony Flowers about the inappropriate touching.

3

22. Plaintiff made oral complaints to Anthony Flowers in May of 2008 that Ms. Gibson had sexually harassed him by putting her hands on him, rubbing up against him, following him around and invading his personal space.

23. In May of 2008, after an incident Mr. Flowers witnessed, he commented that Ms. Gibson was "making a pass" at Plaintiff.

24. Mr. Flowers failed, neglected, and / or refused to take any corrective action or otherwise address Plaintiff's complaints of sexual harassment, but later stated to Plaintiff that he should have taken action.

25. Ms. Gibson was good friends with her supervisor at LAZ Parking, Frank Delmonaco.

26. Mr. Delmonaco also witnessed Ms. Gibson sexually harass Plaintiff.

27. Mr. Delmonaco failed, neglected, and / or refused to take any corrective action against Ms. Gibson for sexually harassing Plaintiff.

28. Plaintiff again made oral report to Mr. Flowers that he had been sexually harassed by Ms. Gibson, but his supervisor again failed, neglected, and / or refused to take corrective action.

29. On or about June 3, 2008, Frank Scott became Plaintiff's direct supervisor.

30. Adam Bryan also works for the Defendant as a Field Service Manager.

31. Plaintiff orally complained of Ms. Gibson's sexual harassment to Mr. Scott and Mr. Bryan right after Mr. Scott became Plaintiff's direct supervisor.

32. In response to the Plaintiff's complaints regarding the behavior of Ms. Gibson, Mr. Scott stated to Plaintiff in front of Mr. Bryan to, "get some (sex) for me."

33. Plaintiff did not find any humor in the comment.

34. Mr. Bryan did not report Mr. Scott's comment to his superiors.

35. Instead, Mr. Bryan reported Plaintiff's complaints about Ms. Gibson to her, prompting her to retaliate against Plaintiff.

36. Plaintiff was also warned in June of 2008 by a LAZ Parking employee named Sonya that someone wanted him "out of there," and that Plaintiff had better "watch his back."

37. Sometime between June 3, 2008 and June 20, 2008, Ms. Gibson falsely alleged that she had observed Plaintiff sleeping while on duty.

38. On or about June 20, 2008, Ms. Gibson went on a scheduled vacation, and a maintenance supervisor for LAZ Parking named Ivan commented to Plaintiff that "your girlfriend is going on vacation."

39. On or about June 23, 2008, Adam Bryan reported to Plaintiff that Ms. Gibson had made an accusation that she had observed him sleeping while on duty, and that she had photographed the incident.

40. During the last week of June 2008, Frank Scott wrote Plaintiff a note regarding the Ms. Gibson's sleeping accusation, which came into the possession of Oliver McCree, a part-time employee of both the Defendant and LAZ Parking.

41. Mr. McCree posted the note where on the glass at the security officer's station where others could see it, causing Plaintiff to feel humiliated.

42. Following the posting of the note, Julius Laloi, another security officer, said to Plaintiff, "I've heard bad things about you."

43. The accusation about sleeping was baseless and no photograph or other evidence of it has ever been produced.

44. On or about July 9, 2008, Plaintiff hand-delivered a written complaint of sexual harassment to Mr. Bryan, Mr. Scott, Jordan Dolger of the human resources department, and Branch Manager Steven Korf.

45. On or about July 11, 2008, after two days passed and no action had been taken in response to his complaint of sexual harassment, Plaintiff went to see Mr. Dolger in person.

46. During the July 11, 2008 meeting, Mr. Dolger became angry and stated that Securitas was a contractor, LAZ Parking was the client, and that Mr. Dolger would not tell the client what to do.

47. Mr. Dolger also stated that he was "the boss," that he had "been a manager" for his "entire life," that Plaintiff would "go back to work," and that Mr. Dolger would "be the one to make the decision."

48. Plaintiff explained that the acts he complained of were videotaped, and that Mr. Dolger could view the tapes himself and evaluate the nature of the touching to make the decision.

49. Plaintiff also requested a transfer.

50. Mr. Dolger responded negatively to Plaintiff's request for a transfer, stating, "I'm the boss, you do what I say."

51. Mr. Dolger also instructed Plaintiff that if anything else were to happen, not to let anyone else know about it until Plaintiff spoke with Mr. Dolger.

52. Mr. Dolger also told Plaintiff that he had to submit another incident report which did not mention Frank Delmonaco's name by Plaintiff's return on Monday, or Plaintiff would be terminated.

53. Plaintiff was upset and called Mr. Dolger later that day, reiterating his request for transfer.

54. Mr. Dolger stated, "Go back to work", in response to Plaintiff's second request for a transfer.

55. Plaintiff submitted his incident report dated July 12, 2008 upon his return to work on July 14, 2008, but again no corrective action was taken.

56. Plaintiff did not omit Frank Delmonaco's name from his July 12, 2008 report because he feared being accused of lying.

57. On or about July 14, 2008, after Plaintiff had met with Mr. Dolger and mentioned that Ms. Gibson's conduct could be observed on tape, he noticed that the security cameras in the office had been removed over the weekend.

58. Following Plaintiff's submission of the written complaints dated July 9, 2008 and July 12, 2008, Mr. Dolger claimed that he forwarded Plaintiff's complaints to Steven Korf, who in turn reported the incident to Frank Delmonaco of LAZ Parking, supervisor of Ms. Gibson.

59. Mr. Dolger also spoke with Security Officer Anthony Flowers, who confirmed that Ms. Gibson had touched Plaintiff by rubbing his shoulders.

60. Sharon Bibb was a Security Officer for the Defendant, is a friend of Ms. Gibson, and was a coworker of the Plaintiff.

61. After Plaintiff reported the inappropriate behavior of Ms. Gibson on July 9, 2008, Ms. Bibb began to sexually harass Plaintiff on July 14, 2008.

62. Ms. Bibb put her hands on Plaintiff inappropriately, despite requests that she not do so.

63. Ms. Bibb also invaded Plaintiff's personal space, despite requests that she not do so.

64. On the morning of July 14, 2008 at approximately 5:00 A.M., Ms. Bibb put her head on Plaintiff's shoulder, which Plaintiff immediately objected to, stating that it was a "hot situation" at work.

65. On or about July 14, 2008 at approximately 7:30 A.M., near the end of Plaintiff's shift, Plaintiff observed Ms. Gibson have a long discussion with Ms. Bibb.

66. Following her conversation with Ms. Gibson, Ms. Bibb asked Plaintiff if she could talk to him, but Plaintiff refused.

67. Ms. Bibb unnecessarily knelt down to whisper something in Plaintiff's ear.

68. Plaintiff asked Mr. Scott, who was present and witnessed this incident, to take corrective action, but Mr. Scott but took no action to prevent such conduct and left without saying a word.

69. Plaintiff then immediately wrote another incident report dated July 14, 2008 and submitted the report to Mr. Scott, and later Mr. Dolger.

70. Mr. Scott called Mr. Bryan on the telephone immediately upon receiving the report and exclaimed, "I can't take this no more."

71. On or about July 25, 2008, upon her return from vacation, Sharon Bibb waited outside the station where Plaintiff was sorting papers and commented in a hostile manner to Plaintiff that he had to wait outside the door while she signed in.

72. Plaintiff reported Sharon Bibb's hostile comment to Mr. Dolger by telephone and also submitted a written incident report dated July 25, 2008.

73. Mr. Dolger responded that he would "get back to" Plaintiff, but he never did.

74. Plaintiff's July 25, 2008 report stated that if the harassment continued, he would report the harassment to headquarters or would resign because of the harassment.

75. On or about July 28, 2008, Ms. Bibb, who worked on the other side of the train station, approached Plaintiff when he was scheduled to open the doors on his side of the train station to let passengers in.

76. Plaintiff attempted to avoid Ms. Bibb, but she followed closely behind Plaintiff yelling, "You did me wrong!"

77. While Ms. Bibb was yelling at Plaintiff, a bus driver for the City of Norwalk named Dennis advised Plaintiff that Ms. Gibson was watching the incident from her car.

78. Plaintiff believed that Ms. Gibson and Ms. Bibb were again attempting to jeopardize Plaintiff's position as a security officer with the Defendant.

79. Plaintiff wrote and submitted a report dated July 28, 2008 regarding the incident in addition to calling Mr. Dolger, but he again failed to take appropriate action.

80. On or about July 30, 2008, Ms. Bibb left a note on the security desk for Plaintiff stating, "I forgive you," and that she prays that, "God heals your mind."

81. Soon after he received note from Ms. Bibb on July 31, 2008, Mr. Scott and Ms. Gibson came to the office where Plaintiff was stationed and asked him if he would start writing tickets at the train station under the supervision of Ms. Gibson.

82. Plaintiff felt it was very inappropriate to be placed under the supervision of Ms. Gibson because he had reported her for sexual harassment.

83. Plaintiff did not refuse the request because he believed he was being set up for insubordination.

84. On or about August 6, 2008, Plaintiff sent a written complaint regarding the sexual harassment and notifying Defendant that he had to seek medical treatment for physical symptoms manifesting from the sexual harassment.

85. Plaintiff began to suffer from severe anxiety and stress because of the sexual harassment, and chose to see one of a list of doctors approved by the Defendant's insurance plan.

86. The doctor asked Plaintiff questions about the cause of his physical stress, and Plaintiff disclosed some of the details of the sexual harassment and retaliation he had experienced.

87. The doctor left the room for a bit, and returned after a conversation with Mr. Dolger, who he called in the interim without Plaintiff's permission.

88. The doctor then asked Plaintiff several questions, including asking why he did not "push" the women off of him since he was such a "big, strong man."

89. The doctor also tried to get Plaintiff to see a psychiatrist.

90. Plaintiff was very irritated that the doctor had discussed his medical condition with Mr. Dolger without his permission.

91. Plaintiff was then advised by his doctor to take leave from his position in order to alleviate the anxiety, hypertension, and sleep dysfunction caused by the sexual harassment.

92. Plaintiff faxed medical documentation he received from the doctor to the Defendant.

93. The medical documentation did not specify a return date for Plaintiff's leave of absence.

94. On or about August 7, 2008, after receiving the medical documentation, Mr. Dolger demanded that all of Plaintiff's medical records be turned over that day, or Plaintiff would be terminated from his position.

95. Plaintiff never returned to the doctor because he revealed confidential medical information to Mr. Dolger without permission to do so.

96. After Plaintiff became aware that Mr. Dolger had discussions with his doctor, and that Mr. Dolger had demanded Plaintiff's medical records, Plaintiff instructed his doctor not to forward Plaintiff's medical records to Mr. Dolger.

97. Plaintiff did not return to the doctor that had revealed his confidential medical information.

98. On or about August 7, 2008, Plaintiff submitted a facsimile stating to the Defendant that he would not return to work until his doctor determined it medically safe for him to do so.

99. Mr. Dolger sent Plaintiff a letter dated August 8, 2008 threatening to terminate him within fifteen (15) days unless he submitted additional forms.

100.   Mr. Dolger sent Plaintiff another letter, dated September 8, 2008, threatening to terminate him within seven (7) days on September 15, 2008 unless he submitted additional forms.

101.   On or about September 23, 2008, Defendant challenged Plaintiff's unemployment compensation claim by stating in a fact-finding report that claimant was on a leave of absence, even though according to Defendant's letter of September 8, 2008, the claimant had been terminated on September 15, 2008.

102.   On or about October 18, 2008, the Defendant challenged Plaintiff's unemployment compensation claim by falsely stating that he voluntarily quit on August 8, 2008, and that he gave no reason and no notice.

103.   Mr. Dolger failed to document in writing any actions taken to prevent Plaintiff from being subjected to sexual harassment.

104.   Julius Laloi later quit his position with the Defendant and took a full-time position with LAZ Parking.

105.   Mr. Laloi later quit his position with LAZ Parking because of harassment by Ms. Gibson.

**Count One:  Title VII – Sexual Harassment**

1-105. Plaintiff hereby re-alleges and reincorporates paragraphs One through One-hundred-five as if more fully set forth herein.

106.   Plaintiff was subjected to sexual advances and harassment at the workplace; Ms. Gibson and Ms. Bibb both subjected the Plaintiff to numerous sexual advances and attempted to jeopardize his position as a security officer.

107.   Plaintiff made Defendant aware that he had been subjected to sexual harassment; Plaintiff complained of the sexual harassment to Mr. Flowers, Mr. Bryan, Mr. Scott, and Mr. Dolger, orally or in writing, no less than fifteen (15) times.

108.   Defendant made adverse employment decisions against the Plaintiff because of his rejection of sexual advances; after Plaintiff rejected the sexual advances of Ms. Gibson, Defendant orally reprimanded the Plaintiff for sleeping on duty because of a false accusation by Ms. Gibson.

109.   Defendant's conduct had the effect of creating an intimidating, hostile, and offensive working environment; the Defendant's failure to take corrective action to prevent further sexual harassment by Ms. Gibson and Ms. Bibb resulted in an intimidating, hostile, and offensive working environment.

110.   Defendant's conduct in failing to take corrective action to prevent further sexual harassment amounted to a constructive discharge of the Plaintiff's employment.

**Count Two:  CFEPA – Sexual Harassment**

1-110. Plaintiff hereby re-alleges and reincorporates paragraphs One through One-hundred-ten of Count One as if more fully set forth herein.

**Count Three:  Title VII – Retaliation**

1-105. Plaintiff hereby re-alleges and reincorporates paragraphs One through One-hundred-five as if more fully set forth herein.

106.   Plaintiff asserted protected rights and / or engaged in statutorily protected activities; Plaintiff made no less than fifteen (15) written and oral complaints to the Defendant regarding sexual harassment.

107.   Plaintiff suffered numerous adverse employment actions, including oral reprimand, subjugation to a hostile work environment, and constructive discharge.

108.   A causal connection exists between Plaintiff's participation in statutorily protected activities and the adverse employment actions taken against him; the adverse employment actions all occurred within a two month period, and additional harassment often directly followed the assertion of protected rights and participation in protected activities.

**Count Four:  CFEPA – Retaliation for Assertion of Protected Rights**

1-108. Plaintiff hereby re-alleges and reincorporates paragraphs One through One-hundred-eight of Count Three as if more fully set forth herein.

**Count Five:  Violation of the FMLA**

1-105. Plaintiff hereby re-alleges and reincorporates paragraphs One through One-hundred-five as if more fully set forth herein.

106.    Defendant is Plaintiff's employer and a covered entity under the FMLA.

107.    Plaintiff was eligible for and requested leave under the FMLA.

108.    The Defendant took adverse employment actions against Plaintiff following his request for FMLA leave; Defendant sent Plaintiff threatening letters, made unreasonable demands for documentation, discussed Plaintiff's medical condition with his Doctor without his permission, and constructively discharged the Plaintiff.

109.    The adverse employment actions occurred under circumstances giving rise to an inference that they were in retaliation for leave requested under the FMLA; the adverse employment actions occurred shortly after his request for FMLA leave.

**Count Six:  Violation of Connecticut FMLA; Conn. Gen. Stat. 31-51, *et seq.***

1-109. Plaintiff hereby re-alleges and reincorporates paragraphs One through One-hundred-nine of Count Five as if more fully set forth herein.

## Prayer for Relief

Wherefore Plaintiff claims the following:

1.   Money damages;

2.   Costs;

3.   Punitive damages, attorneys fees and expert witness fees;

4.   Prejudgment interest;

5.   That this Court retain jurisdiction over this matter;

6.   Trial by jury;

7.   Such other relief as the Court deems just, fair and equitable.


Plaintiff,
James Roundtree

By: _____
Michael T. Petela (ct28251)
Eugene Axelrod (ct00309)
Axelrod & Associates
8 Lunar Drive
Woodbridge, CT  06525
Phone:  (203) 389-6526
Fax:  (203) 389-2656
mtpetela@axelrodlegal.com
eaxelrod@axelrodlegal.com

## DECLARATION UNDER PENALTY OF PERJURY

The undersigned declares under penalty of perjury that he/she is Plaintiff in the above action, that he/she has read the above complaint and that the information contained in the complaint is true and correct. 28 U.S.C. § 1746; 18 U.S.C. § 1621.

Executed in Woodbridge, Connecticut on May 11, 2010.

**Plaintiff's Original Signature**