## UNITED STATES DISTRICT COURT
## DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| JAMES ROUNDTREE, | : | CIVIL CASE NO. |
| Plaintiff, | : | 3:10-cv-778 (JCH) |
| | : | |
| v. | : | |
| | : | |
| SECURITAS SECURITY SERVICES, INC., | : | FEBRUARY 27, 2012 |
| Defendant. | : | |

### RULING RE: DEFENDANT'S MOTION FOR SUMMARY JUDGMENT (DOC. NO. 29)

## I.    INTRODUCTION

The plaintiff, James Roundtree, filed this action against his former employer,

Securitas Security Services, Inc., on May 18, 2010.  Roundtree brings claims under Title

VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e ("Title VII"), the federal Family and

Medical Leave Act, 29 U.S.C. § 2611 et seq. ("FMLA"), the Connecticut Fair

Employment Practices Act, Conn. Gen. Stat. § 46a-60 et seq. ("CFEPA"), and the

Connecticut Family and Medical Leave Act, Conn Gen. Stat. § 31-51kk et seq.

("CFMLA").  On August 25, 2011, Securitas filed a Motion for Summary Judgment on all

claims.  Doc. No. 29.  For the following reasons, the Motion is granted.

## II.    FACTS[1]

The defendant, Securitas Security Services ("Securitas"), provides uniformed

security guard and patrol services for businesses and organizations.  At all times

relevant to the instant action, Securitas provided security services at the Norwalk Train

Station in Norwalk, CT, pursuant to a contract with LAZ Parking, which operated the

station's parking lot.

---

[1] Unless otherwise cited, the following facts are based upon the uncontested portions of the parties' Local Rule 56(a) Statements.

James Roundtree ("Roundtree") was hired by Securitas on or about October 6, 2006, and was assigned to the Norwalk Train Station.  He worked the overnight shift, which lasted from 12:00 a.m. to 8:00 a.m.

Kim Gibson ("Gibson") was an employee of LAZ Parking ("LAZ").  According to Roundtree, she typically arrived at the security office around 5:00 a.m.  Roundtree Deposition (Doc. No. 37-3) at 40-41 ("Roundtree Dep.").  Roundtree claims that, at some point during May 2008, Gibson came up behind him while he was sitting in a chair monitoring the security cameras.  Id.  She then leaned against Roundtree and began "feeling on" his shoulders.  Id. at 41-42.  Roundtree responded by telling Gibson that he was married and would not cheat on his wife.  Id. at 42.  Gibson stopped touching his shoulders and left the room without saying anything.  Id. at 42-43.

Gibson leaned against Roundtree and touched his shoulders in a similar manner twice more within the same month.  Id. at 43-44.  On one of these occasions, LAZ manager Frank Delmonico ("Delmonico") was present.  Id. at 44.

On another occasion, Gibson followed Roundtree out of the security office when he was leaving for the day and leaned against his back.  Id. at 52-53.  Roundtree again told her he was married and walked away toward his van.  Id. at 53-54.  Gibson did not respond.  Id. at 54.

Roundtree reported Gibson's behavior to his direct supervisor, Anthony Flowers ("Flowers"), on multiple occasions.  Id. at 55-57.  Flowers also witnessed Gibson touching Roundtree on at least one occasion.  Id. at 56.  He told Roundtree that Gibson was "making a pass" at him.  Id.  Flowers later told Roundtree that he did not report Roundtree's complaints to anyone else at Securitas, because he was afraid of losing his

job if he did.  Id. at 64.

At some point prior to June 3, Flowers was demoted and Securitas employee Frank Scott ("Scott") become Roundtree's direct supervisor.  Roundtree Dep. at 64.  On June 3, Gibson again leaned against the back of Roundtree's chair and stroked his shoulders.  Id. at 47.  That same day, Roundtree reported Gibson's behavior to Scott and Adam Bryan ("Bryan"), another Securitas supervisor.  Id. at 47.  In response to Roundtree's complaint, Scott told Roundtree to "get some for me."  Id. at 50.  Following this conversation, neither party followed up with Roundtree regarding his complaints.

On July 3, either Bryan or Flowers (or both) told Roundtree that Gibson had reported seeing him sleeping on the job.[2]   Roundtree denied that he had been sleeping, but he did admit that he had turned off the lights in the security office.  Roundtree Dep. at 59-60.  He agreed not to do so in the future.  Id.

On July 10, Roundtree filed a written complaint with Bryan, as well as Steve Korf, the Securitas Branch Manager, alleging harassment by Gibson.  Def.'s Ex. 4.  In the complaint, Roundtree wrote that Gibson had been "touching [his] body inappropriately." Id.  He further noted that Gibson had "displayed this type of behavior in front of Frank Delmonaco, manager of LAZ parking," and that the behavior had previously been reported to Flowers.  Id.

On July 11, Roundtree met with Jordan Dolger ("Dolger"), a Securitas Human Resources Manager, to discuss the complaint.  Dolger told Roundtree that he needed to

---

[2] At one point in his deposition, Roundtree said that Flowers spoke with him about Gibson's allegation that he was sleeping on the job.  Roundtree Dep. at 59-60; see also Plaintiff's Response to Defendant's Statement of Facts (Doc. No. 37-2), ¶ 4 ("Pl.'s 56(a)(2) St.").  Later in the deposition, however, Roundtree said that Bryan called him to discuss the allegation.  Roundtree Dep. at 68-69.  It is unclear whether he was referring to two separate conversations.

submit an official Incident Report form, which Roundtree subsequently provided on July 14.  Def.'s Ex. 5 ("Gibson Incident Report").

Dolger maintains that, at this meeting, he offered Roundtree a change of assignment, which Roundtree declined.  Affidavit of Jordan Dolger, Def.'s Ex. 1 (Doc. No. 32), ¶ 7 ("Dolger Aff.").  Roundtree, on the other hand, claims that he requested a transfer and was denied one.  Roundtree Dep. at 88.

Roundtree further claims that Dolger ordered him to leave Delmonico's name out of the Incident Report form and said that Roundtree would be fired if he failed to do so.  Id. at 85.  He also claims that, when he told Dolger that camera footage from the security office would support his version of events, Dolger said the security tape "was not for [him] to watch."  Id. at 87.  Finally, Roundtree claims that Dolger said he was not going to do anything in response to his complaint.  Id. at 86.

Roundtree does not dispute that, following the meeting, Dolger escalated the complaint to branch manager Korf, who then contacted Delmonico to discuss the matter.  Pl.'s 56(a)(2) St. ¶ 9.  Roundtree also admits that, following his meeting with Dolger, he experienced no further incidents of inappropriate physical contact by Gibson.  Id. ¶ 10.

On July 14, in addition to submitting the Gibson Incident Report, Roundtree submitted a second Incident Report form in which he alleged harassment by fellow Securitas security officer, Sharon Bibb.  Def.'s Ex. 7 ("Bibb Incident Report").  Bibb worked the morning shift at the Norwalk Train Station.  She arrived at the security office each morning at 4:30 to sign in.  After signing in, she would leave the office to assume her post.

In the Bibb Incident Report, Roundtree wrote that Bibb "came into the security office to use the bathroom," was "talking to [him]," and "was kneeling down."  Id.  He further alleged that Bibb's hand had touched him at some point during the previous week, which he said "didn't look right."  Id.  He ended the report by requesting a transfer, stating that "too many people on this site don't like me."  Id.

After receiving the Bibb Incident Report on July 14, Dolger spoke with both Roundtree and Bibb.  According to Dolger, Bibb told him that her only physical contact with Roundtree had been a tap on the shoulder.  Dolger Aff. ¶ 10.  Further, Dolger maintains that Roundtree confirmed that this was all that had occurred.  Id. ¶ 11.  Roundtree, however, claims that Bibb also "placed her head on his shoulder."  Pl.'s 56(a)(2) St. ¶ 13.

In order to limit further interaction between Roundtree and Bibb, a new sign-in procedure was instituted, whereby Roundtree would wait outside the office while Bibb signed in.  On Friday, July 25, however, Roundtree submitted a third Incident Report form to Dolger, this time complaining about the new sign-in procedure.  Def.'s Ex. 9.  He wrote that Bibb "told [him] to wait outside the door while she sign[ed] the time sheet" and stated his view that "[t]he only person to give [him] orders regarding that type of information is a supervisor or management."   Id.  He further noted that he didn't "want any contact with [Bibb]."  Id.  The following Monday, July 28, Roundtree submitted an additional handwritten complaint to Dolger, in which he complained that Bibb had followed him across the parking lot "murmuring behind [him]."  Def.'s Ex. 10.  The complaint did not specify what Bibb was saying, but Roundtree now says that Bibb was murmuring, "You did me wrong."  Roundtree Dep. at 105.

Dolger investigated these complaints and found that "neither constituted harassment as Ms. Bibb was following the order regarding the change in sign-in procedure and Mr. Roundtree could not provide specifics regarding the 'murmuring' that he overheard."  Dolger Aff. ¶ 12.

On August 6,  Roundtree wrote a note to Dolger informing him that he was "stressed out because of a hostile environment," that he could "not sleep on weekend[s] because [his] body [was] going through emotional distress," that he was "suffering so much pain," and that he was "going to [his] doctor for medical help."  Pl.'s Ex. 7.

The following day, Roundtree saw a doctor.  Roundtree Dep. at 113.  According to Roundtree, the doctor left the room at some point during the examination and contacted Dolger.  Id. at 116.  When he returned, he said that Dolger did not think Roundtree needed to take time off.  Id.  He further said he was going to recommend Roundtree to a psychiatrist and that Roundtree "was a big man and . . . could push those girls off."  Id.

Following the visit, Roundtree sent Dolger a fax that read, "I will not be returning to work until doctor determine it."  Def.'s Ex. 11.  Attached to the fax was a doctor's note that stated that Roundtree had been under the doctor's care since "8/7/08," that he suffered from "anxiety, hypertension [and] sleep dysfunction," and that the date on which he would be able to return to work was "to be determined."  Id.

Later the same day, Roundtree's doctor called Roundtree and informed him that Dolger wanted to see his medical records.  Roundtree Dep. at 117.  Roundtree said the doctor could not share them.  Id.

The following day, August 8, Dolger sent a letter asking Roundtree to clarify

6

whether he was "requesting time off for a qualifying reason under FMLA," and, if so, to fill out and return the attached leave request form and physician certification form. Def.'s Ex. 12 ("August 8 Letter").  The letter further informed Roundtree that, if he failed to respond within fifteen days of receipt of the letter, his employment could be terminated.  Id.  Roundtree maintains that he did not receive a copy of this letter until his unemployment hearing on November 10, 2008.  Pl.'s Rule 56(a)(2) St. ¶ 17.

On September 8, Dolger sent a follow-up letter to Roundtree, referencing the August 8 Letter, and attaching additional copies of the required paperwork.   Def.'s Ex. 13 ("September 8 Letter").  This time, Dolger informed Roundtree that, unless that attached forms were returned within 7 days, Roundtree's "extended absence from work [would] not be protected under the provisions of the FMLA."  Id.  Roundtree admits to receiving the September 8 Letter.  Pl.'s Rule 56(a)(2) St. ¶ 18.  He did not respond. Roundtree Dep. at 122.

On September 18, 2008, Roundtree called Dolger.  The content of their conversation is disputed.  Roundtree maintains that he told Dolger he was feeling better and wished to return to work, but that Dolger told him he could not return.  Pl.'s Rule 56(a)(2) St. ¶ 19.  Dolger, on the other hand, claims that Roundtree said he had received the FMLA documentation and chose to do nothing because he wanted to collect unemployment.  Defendant's Local Rule 56(a)(1) Statement ¶ 20 ("Def.'s 56(a)(1) St.").  Both parties acknowledge that Roundtree's employment was terminated following this conversation.  Def.'s 56(a)(1) St. ¶¶ 19-20; Pl.'s 56(a)(2) St. ¶¶ 19-20.

On January 21, 2009, Roundtree filed an Affidavit of Illegal Discriminatory Practices with the Connecticut Commission on Human Rights and Opportunities

7

("CHRO"), alleging that he was the victim of sexual harassment due to the conduct of Kim Gibson and Sharon Bibb.  Def.'s Ex. 16.

## III.   SUMMARY JUDGMENT STANDARD

On a motion for summary judgment, the burden is on the moving party to establish that there are no genuine issues of material fact in dispute and that it is entitled to judgment as a matter of law.  Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256 (1986); White v. ABCO Engineering Corp., 221 F.3d 293, 300 (2d Cir. 2000).  Once the moving party has met its burden, in order to defeat the motion, the nonmoving party must "set forth specific facts showing that there is a genuine issue for trial," Anderson, 477 U.S. at 255, and present such evidence as would allow a jury to find in his favor. Graham v. Long Island R.R., 230 F.3d 34, 38 (2d Cir. 2000).

In assessing the record to address questions of fact, the trial court must resolve all ambiguities and draw all inferences in favor of the party against whom summary judgment is sought.  Anderson, 477 U.S. at 255; Graham, 230 F.3d at 38.  Summary judgment "is properly granted only when no rational finder of fact could find in favor of the non-moving party."  Carlton v. Mystic Transp., Inc., 202 F.3d 129, 134 (2d Cir. 2000).  "When reasonable persons, applying the proper legal standards, could differ in their responses to the question" raised, on the basis of the evidence presented, the question must be left to the finder of fact.  Sologub v. City of New York, 202 F.3d 175, 178 (2d Cir. 2000).

## IV.   DISCUSSION

### A.   FMLA & CFMLA Claims

The court first addresses Roundtree's claims that Securitas retaliated against him

for requesting medical leave in violation of the FMLA and CFMLA.  Compl. at 14.  The FMLA makes it unlawful for any employer either "to interfere with, restrain or deny the exercise of or the attempt to exercise, any right" granted by the statute.  29 U.S.C. § 2612(a)(1)(C).  In order to establish a <u>prima facie</u> case of FMLA retaliation, a plaintiff must demonstrate that "(1) he exercised his rights protected under the FMLA; (2) he was qualified for his position; (3) he suffered an adverse employment action; and (4) the adverse employment action occurred under circumstances giving rise to an inference of retaliatory intent."  <u>Potenza v. City of New York</u>, 365 F.3d 165, 168 (2d Cir. 2004).

With regard to the question of whether a plaintiff exercised rights protected by the FMLA, courts have noted that "an employee seeking leave need not expressly invoke the FMLA in [his] notification."  <u>Slaughter v. Am. Bldg. Maint. Co.</u>, 64 F.Supp.2d 319, 325 (S.D.N.Y. 1999).  "Instead, it is sufficient that [he] give a basis for [his] leave that qualifies under the FMLA."  <u>Id.</u>  After the employee provides the required notice, "the onus shifts to the employer to inquire further if it needs further information to ascertain whether the leave is FMLA-qualifying."  <u>Id.</u>

An employer may "require that a request for leave . . . be supported by a certification issued by the health care provider of the eligible employee."  29 U.S.C. § 2613(a).  When leave is requested due to a "serious health condition that makes the employee unable to perform the functions" of his position, 29 U.S.C. § 2612(a)(D), sufficient certification must include (1) the date on which the serious health condition commenced; (2) the probable duration of the condition; (3) the appropriate medical facts within the knowledge of the health care provider regarding the condition; and (4) a statement that the employee is unable to perform the functions of his position.

29 U.S.C. § 2613(b).  At the time "an employer requests certification, the employer must also advise an employee of the anticipated consequences of an employee's failure to provide adequate certification."  29 C.F.R. § 825.305(d) (2008).[3]  An employer requesting certification should do so within two business days of the leave commencing, 29 C.F.R. § 825.305(c) (2008), and grant the employee at least fifteen days to provide the certification, 29 C.F.R. § 825.311(b) (2008).  "If the employee never produces the certification, the leave is not FMLA leave."  29 C.F.R. § 825.311(b) (2008).

Securitas argues that Roundtree fails to state a prima facie case of FMLA retaliation, because he cannot establish that he properly exercised his rights under the FMLA.  Def.'s Mem. in Supp. (Doc. No. 30) at 30.   The court agrees.

First, the court finds that the doctor's note provided by the plaintiff with his initial fax did not constitute sufficient certification, because it (1) failed to state the date on which Roundtree's "anxiety, hypertension, and sleep dysfunction" commenced; (2) did not provide any estimate of the probable duration of Roundtree's condition; and (3) did not state that Roundtree was "unable to perform the functions" of his position as a result of his condition.  See Def.'s Ex. 11.

Second, the court finds that, in requesting adequate certification on August 8 and September 8, the Securitas complied with applicable regulations by sending the request within two days of the start of Roundtree's leave, by initially allowing fifteen days for

---

[3] Revised FMLA regulations were released by the United States Department of Labor on November 17, 2008.  See 73 Fed. Reg. 67934 et seq. (Nov. 17, 2008).  In this case, however, the court's analysis is guided by the regulations in effect at the time of Roundtree's leave.

response (and ultimately allowing 37 days for response),[4] and by clearly advising Roundtree that failure to provide the requested documentation could result in his termination.  Def.'s Ex. 13.

Roundtree admits to receiving the September 8 Letter, yet he neither complied with Securitas's request for additional information, nor made any good faith effort to do so.  Roundtree Dep. at 120-124.  In his deposition, he says did not understand the attached form, yet he did not contact Securitas or anyone else to seek additional time or a clearer explanation of its request.  Id. at 122-23.  Instead, he simply ignored the request.  As a result, the court finds that Roundtree failed to properly invoke his rights under the FMLA and cannot establish a prima facie case of retaliation under the act.  See Muhleisen v. Wear ME Apparel LLC, 644 F. Supp. 2d 375, 390 (S.D.N.Y. 2009) ("Plaintiff's decision not to complete the FMLA paperwork means that she is unable now to satisfy the first element of her prima facie claim of retaliation.").

With respect to the CFMLA claim, the plaintiff concedes that summary judgment is proper, because he failed to exhaust his administrative remedies.  Pl.'s Mem. in Opp. at 5.  Accordingly, summary judgment is granted with respect to both the FMLA and CFMLA claims.

---

[4] Roundtree does not argue at any point that he would have provided the certification if he had been granted more time to comply.  Instead, he claims that his initial fax on August 7 made any further certification unnecessary.  Pl.'s Mem. in Opp. (Doc. No 37-1) at 17.  Nevertheless, the court notes that the regulations applicable at the time of his leave specified that the employer allow fifteen days from the time of its request, not fifteen days from the employee's receipt of that request.  29 C.F.R. § 825.311(b) (2008) ("When the need for leave is not foreseeable . . . an employee must provide certification . . . within the time frame requested by the employer[,] which must allow at least 15 days after the employer's request . . . .").  Thus, even if a jury were to credit Roundtree's claim that he did not receive the August 8 Letter, Securitas's actions would still be in compliance with applicable regulations.  Further, Roundtree cannot claim that he had no notice of Securitas's desire for additional documentation prior to receipt of the September 8 letter.  As he noted in his deposition, his doctor called him on August 7 and told him that Securitas wanted to see his medical records.  Roundtree Dep. at 117.

B.      Hostile Work Environment Claims

The court next considers Roundtree's claims that, as a result of sexual

harassment by Gibson and Bibb, he was subjected to a hostile work environment in

violation of Title VII and CFEPA.  Compl. at 14. The court analyzes these two claims

together, because "CFEPA claims are governed by the same standards applicable to

Title VII claims."  Jamilik v. Yale University, 362 Fed. Appx. 148, 151 n.2 (2d Cir. 2009).

To establish a sexual harassment, hostile work environment claim, a plaintiff

must show "(1) that the harassment was sufficiently severe or pervasive to alter the

conditions of the victim's employment and create an abusive working environment, and

(2) that a specific basis exists for imputing the objectionable conduct to the employer."

Alfano v. Costello, 294 F.3d 365, 373 (2d Cir. 2002) (internal citations and quotation

marks omitted).  "The test has objective and subjective elements."  Id.  "Conduct that is

not severe or pervasive enough to create an objectively hostile or abusive work

environment—an environment that a reasonable person would find hostile or abusive—

is beyond Title VII's purview."  Harris v. Forklift Systems, Inc., 510 U.S. 17, 21 (1993).

"Likewise, if the victim does not subjectively perceive the environment to be abusive, the

conduct has not actually altered the conditions of the victim's employment, and there is

no Title VII violation."  Id.

To satisfy the objective component of the test, the workplace in question must

have been "so permeated with discriminatory intimidation, ridicule, and insult that the

terms and conditions of [the plaintiff's] employment were thereby altered."  Alfano, 294

F.3d at 374.  In assessing whether this threshold has been reached, courts examine the

case-specific circumstances in their totality and evaluate the severity, frequency, and

degree of the abuse.  Id. at 367 (relevant factors include "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance").  A court "must also consider the extent to which the conduct occurred because of the plaintiff's sex."  Gorzysnki v. JetBlue Airways Corp., 596 F.3d 93, 102 (2d Cir. 2010).

The Supreme Court has "made it clear that conduct must be extreme to amount to a change in the terms and conditions of employment."  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (1998).  Title VII is not a "general civility code," and courts should filter out "complaints attacking the ordinary tribulations of the workplace, such as the sporadic use of abusive language, gender-related jokes, and occasional teasing."  Faragher v. City of Boca Raton, 524 U.S. 775, 788 (2d Cir. 1998) (internal quotation marks and citations omitted).

While not disputing that Roundtree subjectively perceived his environment to be abusive, Securitas argues that the discriminatory conduct alleged by Roundtree was not objectively severe or pervasive enough to support a hostile work environment claim.  Def.'s Mem. in Supp. at 13.  The court agrees.

Cumulatively, Roundtree's allegations of sexual harassment amount to the following:  On four occasions in May and June 2008, Gibson leaned against the back of his chair and touched his shoulders in what he describes as a "sexual manner."  Pl.'s Mem. in. Opp. at 9.  On another occasion within that time period, Gibson walked behind Roundtree in the parking lot and leaned against his back.  At some point in early July, Bibb came into the security office to use the bathroom, kneeled down beside him, and

13

whispered in his ear.  At another point, she laid her head on his shoulder.  At a later

date, after he had reported her behavior, Bibb followed him across the parking lot

mumbling that he had "done her wrong."

The court finds that no reasonable juror could deem this conduct sufficiently

severe and pervasive to materially alter the terms and conditions of Roundtree's

employment.  First, the court notes that, while Roundtree characterizes Gibsons'

behavior as "sexual," Pl.'s Mem. in Opp. at 9, and Bibb's as "inappropriate," id. at 8, the

physical acts he describes—touching his shoulders, laying a head on his shoulder—are

not overtly sexual.  The Second Circuit found similar allegations insufficient to support a

hostile work environment claim in Vito v. Bausch & Lomb, where the plaintiff alleged that

her supervisor "approached her from behind as she sat at her workstation . . . . [and]

pushed against the back of her chair and touched part of her back and side," and that

on "at least two separate occasions [he] touched her shoulder."  403 Fed. Appx. 593,

596 (2010).  In affirming a grant of summary judgment for the defendant employer, the

court noted that, while "no doubt irritating, inappropriate, and offensive," the harassment

alleged was "less severe than the overtly sexual conduct" the court had found

insufficient to sustain a hostile work environment claim in an earlier case. [5]  Id.

In attempting to distinguish Vito, Roundtree points to Gorzynski v. JetBlue

Airways Corp., in which the Second Circuit reversed a district court's entry of summary

judgment on a hostile work environment claim.  Pl.'s Mem. in Opp. at 8.  Roundtree

argues that the conduct at issue in Gorzynski was "significantly less serious" conduct

---

[5] In the earlier case, Quinn v. Green Tree Credit, the court had affirmed a grant of summary judgment for the employer in the face of allegations that the plaintiff's supervisor "deliberately touched [her] breasts with some papers that he was holding" and, on another occasion, told her she had been voted the "sleekest ass" in the office.  159 F.3d 759, 778 (2d Cir. 1999).

than that which he alleges.  Id.  It is true that the physical contact at issue in Gorzynski was not unambiguously sexual.  596 F.3d at 102 (noting that the plaintiff's supervisor "on multiple occasions, grabbed [the plaintiff] and other women around the waist, tickled them, and stared as if he were mentally undressing them").  However, the Gorzynski court focused heavily on the evidence of explicitly sexual and deliberately humiliating comments presented by the plaintiff in that case.  Id. ("Among the comments made by [the plaintiff's supervisor] were his remarks about wanting to suck on or massage breasts and his announcement over the loudspeaker during two final boarding calls that [the plaintiff and other female employees] had previously worked in sexually provocative professions.")  Additionally, the Gorzysnski court noted that the plaintiff's allegations were supported by similar testimony from multiple other female employees, and found that these accounts "when taken together . . . describe[d] a work environment in which a jury could find that men, including [the plaintiff's] supervisor, were able to—and did at will—comment inappropriately on women as sexual objects."  Id. at 103.

Unlike the plaintiff in Gorzynski, Roundtree does not accuse his harassers of making any explicit romantic advances or sexual comments.  Nor is his perception of a hostile workplace supported by testimony from any co-workers. Additionally, unlike the plaintiff in Gorzysnki, Roundtree's harassers were not his supervisors.  For these reasons, the court disagrees that the conduct alleged in Gorzysnski was "significantly less serious" than that alleged in this case.

Ultimately, "[p]rior cases in which [the Second Circuit has] concluded that a reasonable juror could find that the work environment was objectively hostile do not establish a baseline that subsequent plaintiffs must reach in order to prevail."  Schiano

v. Quality Payroll Systems, Inc., 445 F.3d 597, 606 (2d Cir. 2006).  Instead, "determinations are to be made on a case by case basis considering all the individual facts at hand."  Id. at 607.  Thus, the operative question upon this Motion for Summary Judgment is not whether the conduct alleged by Roundtree is more or less severe than that at issue in previous Second Circuit cases; instead, it is whether, taking into account the totality of circumstances, a reasonable juror could find that the harassment alleged by Roundtree was sufficiently severe or pervasive to alter the conditions of his employment and create an abusive working environment.  Because the court finds that no reasonable juror could make such a finding, the defendant's Motion for Summary Judgment is granted with respect to Roundtree's hostile work environment claims under Title VII and CFEPA.

      C.    Retaliation Claims

      Finally, the court evaluates Roundtree's claims that he was retaliated against for making harassment complaints in violation of Title VII and CFEPA.  Compl. at 13-14.  Again, the federal and state law claims are evaluated under the same legal standard See Jamilik v. Yale University, 362 Fed. Appx. 148, 151 n.2 (2d Cir. 2009).

      i.    Exhaustion Requirement

      In arguing for summary judgment on these counts, Securitas first contends that this court has no subject matter jurisdiction over Roundtree's retaliation claims because he failed to include them in the Affidavit of Illegal Discriminatory Practices he submitted to the CHRO ("CHRO Affidavit").  Def.'s Mem. in Supp. at 4.  Retaliation "[c]laims not raised in an administrative complaint . . . may be brought in a federal court only if they are reasonably related to the claim[s] filed with the agency."  Williams v. New York City

Housing Authority, 458 F.3d 67, 70 (2d Cir. 2006) (internal quotation marks omitted).  A claim is considered reasonably related if the conduct complained of would fall within the scope of the [administrative] investigation which can reasonably be expected to grow out of the charge that was made."  Id. (internal quotation marks omitted).  "The central question is whether the complaint . . . gave [the] agency adequate notice to investigate discrimination on both bases."  Id. (internal quotation marks omitted).

Roundtree did not check the boxes for "terminated" or "retaliated against" on the cover sheet of his CHRO Affidavit.  Def.'s Ex. 16 ("CHRO Aff.").  In the affidavit itself, he noted that he left his job on August 7, but he did not claim, as he does now, that he was involuntary terminated.  Id. ¶ 11 ("I saw a doctor for my stress on August 7, 2008. I was advised to leave the environment of my job in order to alleviate my stress, since the company was not doing anything to remedy the situation, and did so the following day.").

Roundtree points to paragraph four of the CHRO Affidavit, in which he stated that Dolger "became angry" when Roundtree reported Gibson.  Pl.'s Mem. in Opp. at 4; CHRO Aff. ¶ 4.   Roundtree did not state, however, that Dolger took any adverse actions against him in response to the complaint.

Roundtree also cites paragraph five of the CHRO Affidavit, in which he noted that, after he complained about Gibson, Sharon Bibb began to harass him in a similar manner.  Pl.'s Mem in Opp. at 4; CHRO Aff. ¶ 5.  Yet the affidavit did not suggest that Bibb's behavior was motivated by Roundtree's complaint against Gibson, much less that it was encouraged by Dolger or other Securitas managers.  Roundtree noted that Securitas failed to discipline Bibb for her actions, CHRO Aff. ¶ 7-8, but that is not a

claim of retaliation in response to a sexual harassment complaint.  Instead, it is an allegation of managerial inaction in the face of ongoing sexual harassment.

Because the court finds that an administrative investigation into Securitas's allegedly retaliatory acts could not reasonably be expected to grow out of the charges in the CHRO Affidavit, Roundtree's retaliation claims are barred for lack of subject matter jurisdiction.

ii.    Merits of the Retaliation Claims

Even if the court had subject matter jurisdiction over Roundtree's retaliation claims, the defendants would be entitled to summary judgment on the merits of the claims.  Like his FMLA retaliation claim, Roundtree's Title VII and CFEPA retaliation claims are analyzed under the burden-shifting framework of McDonnell Douglas. Slattery v. Swiss Reinsurance Am. Corp., 248 F.3d 87, 94 (2d Cir. 2001).  To make out a prima facie case of retaliation, Roundtree must establish by a preponderance of the evidence that (1) he participated in a protected activity known to the defendant, (2) he suffered an adverse employment action, and (3) there exists a causal connection between the protected activity and the adverse employment action.  Id.

To support a retaliation claim, an adverse employment action must be one "that would have been materially adverse to a reasonable employee."  Burlington Northern & Santa Fe Railway Co. v. White, 548 U.S. 53, 57 (2006).  Actions are "materially adverse" if they are "harmful to the point that they could well dissuade a reasonable worker from making or supporting a charge of discrimination."  Id.  "Petty slights or minor annoyances that often take place at work do not constitute actionable retaliation." Hicks v. Baines, 593 F.3d 159, 165 (2d Cir. 2010) (internal citations and quotation

18

marks omitted).

The plaintiff's burden in establishing a <u>prima</u> <u>facie</u> case "is <u>de</u> <u>minimis,</u> and the court's role in evaluating a summary judgment request is to determine only whether proffered admissible evidence would be sufficient to permit a rational finder of fact to infer a retaliatory motive." <u>Hicks v. Baines</u>, 593 F.3d 159, 164 (2d Cir. 2010) (internal citations and quotation marks omitted).

If the plaintiff establishes a <u>prima</u> <u>facie</u> case, "a presumption of retaliation arises." <u>Jute v. Hamilton Sundstrand Corp.,</u> 420 F.3d 166, 173 (2d Cir. 2005).  The burden then falls on the defendant to "articulate a legitimate, non-retaliatory reason for the adverse employment action."  <u>Id.</u>  If such proof is offered, "the presumption of retaliation dissipates and the employee must show that retaliation was a substantial reason for the adverse employment action."  <u>Id.</u>

It is undisputed that, by complaining to his supervisors about sexual harassment by Gibson and Bibb, Roundtree engaged in a protected activity of which the company was aware.  Def.'s Mem. in Supp. at 22; <u>see also</u> <u>Kotcher v. Rosa & Sullivan Appliance Ctr., Inc.</u>, 957 F.2d 59, 65 (2d Cir. 1992) ("A complaint of discrimination made to management or a supervisor is a protected activity.").  Securitas argues, however, that Roundtree has failed to adduce evidence of any adverse employment actions with a causal connection to his complaints.  Def.'s Mem. in Supp. at 22.  The court agrees.

The first retaliatory act alleged by Roundtree is the "oral reprimand" he received from Bryan for allegedly sleeping on the job.  <u>See</u> Compl. at 13; Pl.'s Mem. in Opp. at 13.  The court first notes that, based on Roundtree's own description, it is doubtful that his conversation with Bryan about the accusation can fairly be considered a "reprimand"

that would dissuade a reasonable worker from making or supporting a charge of discrimination.  See Roundtree Dep. at 68 ("[Dolger] told me that [Gibson] called him and said I was sleeping on the job, and she took pictures.  And he stated, Your friend – your friend is getting you in trouble.  That's what he stated on the phone."); see also St. Jean v. United Parcel Service General Service Co., No. 09-cv-3782, 2012 WL 71843, at *7 (E.D.N.Y. Jan. 10, 2012) ("Merely receiving warnings and other disciplinary notices, especially for behavior that violated company rules, does not constitute a change in working conditions that is more disruptive than a mere inconvenience.") (internal quotation marks and citations omitted).

Second, even assuming that the conversation constituted a materially adverse employment action, Securitas has offered a legitimate, non-discriminatory reason for its action:  it was responding to a complaint from Gibson.  Roundtree does not dispute that Gibson made the underlying allegation.  Pl.'s 56(a)(2) St. ¶ 4.  Furthermore, while he claims that Bryan knew Gibson's allegation was untrue, Pl.'s Mem. in Opp. at 14, he admits that he had been engaging in a behavior—turning the lights off in the security office—that might give passersby the impression that he was sleeping, Roundtree Dep. at 59-60.

Roundtree points to no evidence that suggests that Bryan's substantial motivation in confronting him with Gibson's allegation was retaliation for filing a harassment complaint, rather than genuine concern that he was violating company rules.  The court notes that Gibson's own motives in making the allegation are irrelevant to the question of whether Securitas is liable for retaliation.  Gray v. City of New York, No. 08-cv-2840, 2011 WL 6153635, at *14 (E.D.N.Y. Dec. 12, 2011) ("It must be

stressed that in discrimination and retaliation cases, we are decidedly not interested in

the truth of the allegations against plaintiff.  We are interested in what motivated the

employer . . . the factual validity of the underlying imputation against the employee is

not at issue.").  Accordingly, the court finds that the oral reprimand Roundtree received

on July 3 cannot support a claim of retaliation.

Roundtree also alleges that, following the submission of his complaint, he was

"subjected to an environment in which [his] supervisor and other individuals would

harass the Plaintiff and repeatedly try to get [him] to take actions that would subject him

to discipline."   Pl.'s Mem. in Supp. at 14.  Examples of this allegedly harassing conduct

include the previously described incidents in which Bibb rested her head on Roundtree's

shoulder and followed him across the parking lot muttering that he had done her wrong,

Pl.s Mem. in Opp. at 14; an incident in which "Mr. Scott and Mr. Flowers tried to get

[Roundtree] to leave his post and go listen to a car radio, which would have subjected

[him] to discipline, id.; an incident in which Bibb called Roundtree in the Security office

and asked him to come to the other side of the train station to see "his friend," in what

Roundtree interpreted as another attempt to get him in trouble, Roundtree Dep. at 94;

and, finally, an incident in which Roundtree arrived at the security office  to find a note in

the window instructing him not to sleep on the job.[6]   The court finds that no reasonable

juror could deem these materially adverse employment actions.  Instead, they are just

the kind of "petty slights or minor annoyances that often take place at work [and] do not

constitute actionable retaliation."  Hicks v. Baines, 593 F.3d 159, 165 (2d Cir. 2010).

---

[6] To support his allegation regarding the note in the security office window, Roundtree cites a portion of his deposition that was not submitted by either party in connection with this Motion.  See Plaintiff's Statement of Disputed Issues of Material Fact (Doc. No. 37-2) ¶ 35 (citing Roundtree Dep. at 75).

Despite the plaintiff's assertions to the contrary, Pl.'s Mem in Supp. at 14, this remains true whether the incidents are considered individually or in the aggregate.  See Tepperwein v. Entergy Nuclear Operations, Inc., 663 F.3d 556, 572 (2d Cir. 2011) ("Individually the actions were trivial, and placed in context they remain trivial.  Taken in the aggregate, the actions still do not adversely affect the plaintiff in any material way. Zero plus zero is zero.") (internal quotation marks and citations omitted).

Finally, Roundtree alleges that the termination of his employment with Securitas was a retaliatory act.[7]  Pl.'s Mem. in Opp. at 13.  Termination is unquestionably a materially adverse employment action, but the court finds that Roundtree has not presented evidence sufficient to allow a reasonable juror to infer that his termination was in retaliation for his harassment complaints.   It is true that, in making out a prima facie case, a plaintiff can establish an inference of causation "indirectly, by showing that the protected activity was followed closely by discriminatory treatment."  Gordon v. N.Y. City Bd. Of Educ, 232 F.3d 111, 117 (2d Cir. 2000).  The Second Circuit, however, has "not drawn a bright line to define the outer limits beyond which a temporal relationship is too attenuated to establish a causal connection."  Gray, 2011 WL 6153635, at *12 (internal quotation marks and citations omitted).

Roundtree points to the fact that he was terminated a "mere month following the last of his complaints."  Pl.'s Mem. in Opp. at 15.  He neglects to mention, however, that he was absent from work for that entire month and that, during that month, he neither

---

[7] In his Complaint, Roundtree alleges "constructive discharge." Compl. at 13. In his response to the defendant's Motion for Summary Judgment, however, he does not pursue this claim, instead arguing actual discharge.  Pl.'s Mem. in Opp. at 13.  In any event, the bar for establishing a claim of constructive discharge is even higher than that for a hostile work environment claim.  Fincher v. Depository Trust & Clearing Corp., 604 F.3d 712, 725 (2004).  Thus, the court's grant of summary judgment on Roundtree's hostile work environment claims means that his constructive discharge claims would necessarily fail as well.

responded to Securitas's request for additional medical certification nor had any other contact with the company.  Even if the temporal proximity between Roundtree's complaints and termination are sufficient to allow an inference of causation and make out a <u>prima</u> <u>face</u> case, Securitas meets its burden of proffering a legitimate, non-discriminatory justification for the termination:  Roundtree's non-compliance with its permissible request for additional medical certification.  This shifts the burden back to Roundtree to show that Securitas's proferred justifications were a mere pretext for impermissible retaliation.

Beyond conclusory statements, <u>see</u> Pl.'s 56(a)(2) St. ¶ 20, Roundtree offers no evidence to support a finding of pretext.  As a result, he has failed to raise a material issue of fact as to whether his termination was a retaliatory act.  <u>See</u> <u>El Sayed v. Hilton</u> <u>Hotels Corp.</u>, 627 F.3d 931, 933 (2d Cir. 2010) ("The temporal proximity of events may give rise to an inference of retaliation for the purposes of establishing a prima facie case of retaliation under Title VII, but without more, such temporal proximity is insufficient to satisfy appellant's burden to bring forward some evidence of pretext."); <u>Roa v. Mineta</u>, 51 Fed. Appx. 896, 900 (2d Cir. 2002) ("Although courts may infer a causal connection when an adverse action takes place shortly after the protected activity . . . [the Second Circuit has] affirmed summary judgment against the plaintiff when there was no evidence of causation other than timing.") (internal citations omitted).

## V.    CONCLUSION

For the foregoing reasons, the defendant's Motion for Summary Judgment (Doc. No. 29) is granted.

**SO ORDERED.**

Dated at Bridgeport, Connecticut, this 27th day of February, 2012.

 /s/ Janet C. Hall
Janet C. Hall
United States District Judge